# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 23, 2009 Session

## STATE OF TENNESSEE v. DAVID A. PHILLIPS

### Direct Appeal from the Criminal Court for Washington County
### No. 32124     Robert E. Cupp, Judge

---

### No. E2008-01420-CCA-R3-CD - Filed April 7, 2010

---

A Washington County Criminal Court jury convicted the appellant, David A. Phillips, of reckless homicide, vehicular homicide, reckless aggravated assault, felony reckless endangerment, and misdemeanor drag racing. The trial court merged the reckless homicide conviction into the vehicular homicide conviction and sentenced the appellant to six years. The trial court sentenced the appellant to two years for the reckless aggravated assault conviction and one year for the felony reckless endangerment conviction with all the sentences to be served concurrently for a total effective sentence of six years. The trial court dismissed the misdemeanor drag racing conviction because it was barred by the statute of limitations. On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions; (2) the trial court erred by denying his motion to sever his trial from that of his co-defendant; (3) the trial court erred by allowing two State witnesses to give improper testimony; (4) his sentence is excessive and the trial court should have ordered alternative sentencing; and (5) the trial court erred by denying his motions for judgment of acquittal and a new trial. Upon review, we affirm the judgments of the trial court but remand the case to the trial court for entry of a corrected judgment as to the appellant's felony reckless endangerment conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed and the Case is Remanded.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Richard W. Pectol and Jeffrey P. Miles, Johnson City, Tennessee, for the appellant, David A. Phillips.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; and Al Schmutzer, District Attorney General Pro Tempore, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

This case relates to a drag race between a Ford Mustang and a Dodge Viper in Johnson City that resulted in the Mustang's crashing into a Honda CRV. Originally, the appellant was charged by presentment for the second degree murder of Cortney Hensley and the attempted second degree murders of Courtney Beard and Carissa Street.[1] Subsequently, the appellant was "re-indicted" by a grand jury for the second degree murder of Hensley, the attempted second degree murder of Beard, the vehicular homicide of Hensley, the reckless aggravated assault of Beard, felony reckless endangerment, and drag racing. The appellant was tried jointly with his co-defendant, Bradley Mullins.

Janice Conner testified at trial that on the night of September 24, 2005, she and her husband, Howard, were riding in the back seat of a car being driven north on North Roan Street by Joe Doane. Joe's wife, Debbie, was riding in the front passenger seat, Janice was sitting behind Debbie, and Howard was sitting behind Joe.[2] North Roan Street was a four-lane highway, and the Doane car was traveling in the north-bound right lane. Janice said that other cars were traveling on the road and that "North Roan Street tends to be heavily trafficked at that time of night." She said that she noticed the car behind the Doane car had "a very powerful sounding engine" and that she could feel the engine's vibration. Janice stated that as the loud car passed in the north-bound left lane, she saw it was "a very impressive sparkly [black] Mustang." After the Mustang passed the Doane car, Janice saw a red Viper behind the Mustang. She said the Viper was following the Mustang "way too closely than you would ordinarily follow a car." The Doane car moved into the left lane, approached the Sunset Drive/Princeton Road intersection, and stopped at the red traffic light. The Mustang and the Viper also were stopped at the light, but the Viper had moved into the right lane and was beside the Mustang. The Mustang and the Viper were the first two cars in their lanes. The Doane car was behind the Mustang in the left lane, and at least one car separated the Doane car from the Mustang.

---

[1] In the trial transcript, Street's first name is spelled "Karissa." However, we have chosen to use the spelling contained in the presentment.

[2] Because some of the witnesses in this case share a surname, we have chosen to utilize their first names for clarity. We mean no disrespect to these individuals.

-2-

Janice testified that while stopped at the intersection, she heard at least one engine revving. She also saw tires spinning and a lot of black smoke coming from the tires. She said the smoke was "wafting to the left of the Mustang." She said that as soon as the traffic light turned green, the Mustang and the Viper "took off very abruptly" and disappeared over the top of a small hill. When the Doane car crested the hill and headed down the other side, Janice saw a police car traveling south on North Roan Street and saw the car's blue lights turn on. She stated that at that moment, she saw the Mustang "take off like a rocket." As the Mustang approached Interstate 26, it moved into the right lane and onto the right shoulder. It was still traveling at a high rate of speed and was passing other cars. Janice said she was focused on the Mustang and was not paying attention to the Viper. She said that the Mustang looked like it jerked to the left and that she saw "a puff of dust that went very high." She then saw a large explosion. As the Doane car approached the crash site, Janice saw a car engulfed in flames and people trying to get to the car in order to help its occupants. She said that prior to the crash, she last saw the Viper "just before we got to the exit ramp that would lead up to [Interstate] 26, near where Bennigan's used to be." She did not remember if the Viper was traveling fast or slow at that time.

Janice testified that Joe Doane turned right onto Springbrook Drive in order to avoid the crash scene. As the Doane car was traveling east on Springbrook, Janice saw the Viper traveling west on Springbrook and toward the direction of the crash.

On cross-examination, Janice testified that the crash occurred north of Springbrook Drive. About the time of the crash, a police car with its blue lights flashing and traveling north on North Roan Street passed the Doane car. Janice never saw the Viper in front of the Mustang. She acknowledged that she gave a statement to Lieutenant Becky West on September 26, 2005, and that she said in the statement the Mustang revved its engine and spun its tires, creating a lot of smoke. She also acknowledged saying in the statement that as the cars reached Browns Mill Road, "the Viper immediately slowed to their right" while the Mustang "rocketed north." She acknowledged that Joe Doane had a better view of the events than she did.

Keith Harris testified that about 11:30 p.m. on September 24, 2005, he and his wife were driving north on North Roan Street. At Harris' location, there were three north-bound lanes: a left lane, a right lane, and a far-right turn lane for turning right onto Springbrook Drive. Harris was in the left lane when a Mustang, also traveling north, passed him in the right turn lane. He estimated that the Mustang was traveling 100 to 120 miles per hour. Harris saw the Mustang swerve and run into the back of a Honda CRV stopped in the right lane at a red traffic light. Harris thought the Mustang swerved to avoid a concrete median.

Harris testified that the Mustang went underneath the CRV, lifting the CRV off the ground, and that the "contents of the [CRV] just . . . went flying out everywhere." The two cars, still together, slid. They separated, the CRV turned 180 degrees, and the Mustang came to a stop. The CRV, facing south, caught fire and came to a stop. Harris saw a police officer pull a young woman out of the burning CRV's driver's side. The driver of the Mustang, who was the appellant's co-defendant, got out of the car and sat on the street curb near the area the officer laid the injured woman. Harris stated that the CRV was completely engulfed in flames and that he could not see another person in the car.

Johnson City Police Officer Jeff Wilson testified that on the night of September 24, 2005, he was driving south on North Roan Street and that Officer Tony Ward was riding with him. Officer Wilson stated that as they drove under the Interstate 26 bridge, Officer Ward said, "[L]ook there." Officer Wilson saw a black car and a red car stopped at a traffic light at the intersection of North Roan and Broyles Streets. Officer Wilson said that the black car, later identified as a Mustang, was doing a "burn out," smoking its tires. The red car was stopped beside the Mustang. Officer Wilson stated that he heard an engine revving and that "both vehicles took off at a pretty fast pace" when the light turned green. He said that as his patrol car approached the two cars, he noticed that "the red vehicle had hit his brakes" while the Mustang "continued to accelerate at a high rate of speed on past myself and Officer Ward." Officer Wilson tried to make a u-turn but could not pull out due to north-bound traffic. He turned on his emergency lights but still could not pull into traffic. Six to eight seconds later, Officer Wilson saw Officer Charles Fobbs' patrol car approaching North Roan Street from Broyles Street. Officer Fobbs turned on his emergency lights and pulled into north-bound traffic, stopping it so Officer Wilson could make the u-turn. Officer Wilson drove north on North Roan Street but lost sight of the red and black cars and turned off his emergency lights.

Officer Wilson testified that as he approached the Interstate 26 bridge, he saw "a big ball of flame." He turned on his emergency lights and video camera, approached the crash scene, and angled his patrol car to block traffic. He got out of his car and heard someone in the crowd say a person was trapped in the burning car. Officer Wilson ran to the CRV and saw a person wearing a white shirt. He said he reached inside and saw that the person, Courtney Beard, was "burnt pretty bad." He grabbed her arm, and some of her skin came off in his hand. A woman helped Officer Wilson pull Beard out of the car, and he moved her to the curb. He said Beard "started coming around" and told him Cortney Hensley was also in the car. He said that while he was helping Beard, Officer Ward was "dealing with" Bradley Mullins.

On cross-examination, Officer Wilson testified that when he saw the Mustang and the Viper stopped beside each other at the intersection, he was focused on the Mustang because

its tires were "smoking." He stated that when the light turned green, the Mustang "[took] off at a high rate of speed" and that the Viper "pulled out fast." He acknowledged that a few seconds passed between the time the crash occurred and his arrival at the scene and that he did not know what happened at the scene during that time. When he reached into the burning CRV, the fire seared some hair off his arms, but, otherwise, he was uninjured. He saw a small amount of blood on Mullins' face, but he did not see any burns on Mullins.

Officer Wilson testified that in the early morning hours of September 25, 2005, he wrote a statement about the events and gave it to his captain. He acknowledged that his memory of the events would have been clearer at that time than it was at trial. He also acknowledged that in his statement, he did not mention anything about a red Viper. He explained that he saw the red Viper and the Mustang stopped at the intersection but that he was primarily focused on the Mustang. He said his statement did not mention the Viper because "at that time I didn't know what kind of car it was." Officer Wilson did not see the Viper at the crash scene but later learned it was there. He acknowledged that in his statement, he did not say the Mustang and a red car were racing.

Johnson City Police Lieutenant Becky West testified that she was the investigating officer for this case and arrived at the crash scene after the fire department extinguished the fire. She said that the inside of the CRV was "burnt out" and that she found a body on the passenger side. The CRV's front passenger seat was almost lying flat from the impact, and the body was on the seat. Lieutenant West said that in order to see the body, a person had to walk up to the car and look inside. She could not tell if the body was male or female.

Lieutenant West testified that she found the results of two dynamometer tests in the Mustang and that a dynamometer was used to measure a car's horsepower and torque. The last four vehicle identification numbers on the tests matched those of the Mustang. One test showed the Mustang had 507.3 horsepower, and the other test showed it had 506 horsepower. Lieutenant West took measurements at the crash scene that night; the next morning, a Sunday; and on Monday, September 26. While she and other officers were at the crash scene on Sunday morning, the appellant arrived and asked about the investigation. Lieutenant West told him that the police had a lot of witnesses to interview and that the investigation was in its preliminary stages. The next day, Monday, the appellant returned to the scene and asked Lieutenant West if she knew anything about the investigation. He also asked her if he needed to hire a lawyer, and she told him that she did not know. She said her measurements showed that the distance from the Sunset Drive/Princeton Road intersection to the site of the impact at Springbrook Drive was 2,838.47 feet, about one-half mile.

On cross-examination, Lieutenant West acknowledged that she never suspected the appellant or Mullins was impaired on the night of September 24. She said that she had

known the appellant for about twenty years but that she had never associated with him. She acknowledged that the appellant trusted her and that it did not surprise her when he asked about a lawyer. She also acknowledged that the appellant was at the scene after the wreck and that two people at the scene accused him of drag racing. However, the appellant denied racing.

Dr. William McCormick, the Deputy Chief Medical Examiner for the State of Tennessee, testified that he performed Cortney Hensley's autopsy. One hundred percent of Hensley's body was burned. She also sustained bilateral pelvic fractures at the time of the impact. She died of trauma, both thermal and non-thermal, and her death was due to burning.

On cross-examination, Dr. McCormick acknowledged that Hensley's pelvic fractures caused a microscopic migration of emboli into her lungs. He also acknowledged that pulmonary emboli could be fatal and cause death within a very short period of time. However, he could not say Hensley's pulmonary emboli would have been fatal. He stated that the plastic materials in a burning car released cyanide and that the level of cyanide in Hensley's body was negative, indicating her death was very rapid.

David Cindrick testified that he was an internal auditor and inventory control manager for Grindstaff Automotive Group in Elizabethton, Tennessee, and was familiar with the 2004 Dodge Viper that Grindstaff sold to the appellant. He said a Dodge Viper came "stock" from the factory with 500 horsepower. He said that the car had 525 pounds of torque, "a lot of torque . . . for a vehicle of that caliber," and that its speed could increase from 0 to 60 miles per hour in less than 5 seconds. Cindrick said the car had a 10-cylinder engine, had a 6-speed manual-shift transmission, and was "designed to be a high performance street race car." He stated that there was "a special clientele for that kind of vehicle" and that Grindstaff's inventory usually included only one Viper per year due to the car's price.

Johnson City Police Lieutenant Larry Williams, an accident reconstructionist, testified that he obtained the distances the Mustang and the CRV traveled after impact, inspected the cars, and viewed photographs of them. He said the Mustang had a "100% overlap of contact with the . . . CRV." The CRV's drive shaft was completely severed, punctured the gas tank, and fell onto the road. All of the CRV's back windows shattered, and its entire frame buckled. From the point of impact, the CRV traveled 296 feet, and the Mustang traveled 310 feet. The cars traveled 112 feet together before they separated. Based on Lieutenant Williams' calculations, the Mustang was traveling 124 miles per hour when it hit the CRV. Prior to the impact, the Mustang was traveling 133 miles per hour when Mullins first applied the brakes.

Kimberly Patterson testified that on the night of September 24, 2005, she was a passenger in a car being driven by Susan Cutshaw on North Roan Street. She said that as they were traveling north in the right lane, Patterson looked in the car's side-view mirror and saw a Mustang, also in the right lane, "flying up" behind them. She said that Cutshaw "tapped" the brakes and that the Mustang moved into the far-right lane. The Mustang was traveling over 100 miles per hour and passed them. She stated that the Mustang's driver "tapped his brakes," that the car "fishtailed," and that the car hit a CRV. Patterson said she saw flames and saw the two cars "pushing down through the red light." Cutshaw pulled over, and Patterson called 911. Cutshaw ran to the CRV and helped a man pull Courtney Beard out of the car. On cross-examination, Patterson testified that she did not see a red Viper.

Susan Cutshaw testified that on the night of September 24, 2005, she was driving north on North Roan Street. Three passengers, including Kimberly Patterson, were riding with her. She said that as she approached the intersection with Springbrook Drive, she looked in her rearview mirror and saw a Mustang "coming up fast" behind her. Cutshaw and the Mustang were both in the right lane. She was afraid the driver of the Mustang did not see her, so she tapped her brakes to let him know she was there. She said the Mustang moved to the right, moved into the interstate exit ramp lane, and passed her "like I was setting [sic] still." The Mustang continued toward the Springbrook Drive intersection, swerved to the left, and hit a CRV. Cutshaw drove to the crash, told Patterson to call 911, and helped a man pull Courtney Beard out of the burning CRV.

On cross-examination, Cutshaw testified that when she turned onto North Roan Street from Sunset Drive, she did not see any cars with smoking tires. She said that as she drove along North Roan Street, she had a clear view of the road behind her in her rearview mirror and did not see a red Viper. She also did not see a Viper at the crash scene. Cutshaw acknowledged that she saw the Mustang fishtail before the crash.

Ben Stevens testified that on the night of September 24, 2005, he was driving north in the right lane on North Roan Street. As he pulled up to the stoplight at the Sunset Drive/Princeton Road intersection, a red Viper cut him off at the traffic light. Stevens was stopped directly behind the Viper, and a Mustang was in the left lane. Stevens said that while they were stopped at the light, the Viper "started inching through the red light revving [its] motor" and looked "like [it] was getting ready to run the red light." The Viper's convertible top was down, and Stevens saw the appellant driving. He said the Mustang "didn't move an inch" but that both cars "took off like a shot" when the light turned green. He stated that the Mustang was "gone . . . just like shooting a bullet out of a gun" but that the Viper "had backed off." Stevens did not see where the Viper went but saw the Mustang go over a hill. Stevens saw a fireball and drove north to see what had happened. He pulled into a parking

lot and walked to the crash. He said that he saw the Viper and the appellant and that the appellant told him the appellant "hadn't done anything, that they would try and pin it on him, that he . . . wasn't racing." Stevens said he became angry and told the appellant that the appellant was wrong because Stevens had seen the appellant "take off from the red light." Stevens said a policeman saw him and the appellant "sort of having an altercation" and separated them.

On cross-examination, Stevens testified that he did not see a large cloud of smoke coming from the Mustang while it was stopped at the intersection. He also did not hear the Mustang's engine revving or see its tires spinning until the light turned green. He said that although the Mustang and the Viper sped away from the traffic light, the Viper "backed off about Bennigan's." Prior to the crash, a police car in pursuit of the Mustang passed Stevens.

Stephanie DeMaria testified that about 9:00 p.m. on September 24, 2005, she was riding with her husband, who was driving their Dodge Neon on Highway 11E toward Johnson City, when a red Viper tried to race them. DeMaria explained, "He would jerk his car forward, and then ease off to where he'd fall back with us, and then jerk forward, and then fall back, and rev his engine up." She said they did not race the Viper, so the Viper drove ahead of them and raced a Nissan 350Z. Later that night, DeMaria saw the Viper trying to race a Mustang. She said the Viper would pull forward, fall back, and "rev it up, and then get right back up next to [the Mustang]." She and her husband continued to ride around Johnson City until they saw the crash scene involving the CRV. The fire department was extinguishing the fire, and DeMaria saw the Viper parked in a parking lot. She said she spoke with the police and told an officer about "how the Viper was acting with us" earlier that night.

On cross-examination, DeMaria testified that when the Viper tried to race them, she and her husband "looked at him and shook our head no." She acknowledged that she saw the Viper trying to race the Mustang "close in time" to when she and her husband came upon the crash scene.

Nineteen-year-old Courtney Beard testified that on September 24, 2005, she was a high school student. The last thing she remembered prior to the Mustang crashing into her car was stopping at Walgreens where Cortney Hensley was having some photographs developed. The next thing she remembered was waking up in the hospital at Vanderbilt. She said that since the wreck, she had had twelve surgeries and five laser treatments for her burns. The State rested its case-in-chief.

Twenty-year-old Bradley Mullins testified that on September 24, 2005, he was eighteen years old. About 8:30 p.m., he picked up Carissa Street, and they rode around town

in his Mustang. While driving around, Mullins saw a red Viper a few cars ahead of him. Mullins was driving in the left lane, and the Viper was in the right lane. Mullins was not speeding but passed the Viper with the flow of traffic. While passing the Viper, Mullins admired the car but did not look at the appellant. Just below Science Hill, the appellant pulled up beside Mullins and revved the Viper's engine. Mullins said that at the top of Science Hill, the appellant revved the Viper's engine again and "pull[ed] forward in a very aggressive manner, and then [came] back." Mullins stated that as the cars were traveling down Science Hill, the appellant "took off again the same way" and "kept revving his engine at me." At the bottom of the hill, Mullins finally revved the Mustang's engine. He said that the appellant "would come straight back up to me" and that he began to get aggravated with the appellant. When the cars stopped at a traffic light, the appellant pulled up beside Mullins and revved the Viper's engine again.

Mullins testified that when the light turned green, he pulled ahead of the Viper and moved into the right lane. He looked in his rearview mirror and saw police lights. The lights distracted him, and when he looked forward at the road, he saw taillights. He swerved to the right, saw a concrete barrier, and swerved back to the left, losing control of the Mustang and hitting the CRV. When the Mustang came to a stop, Mullins got out, went to the CRV, and pulled Courtney Beard out of the car. He went around to the other side of the CRV to see if anyone else was inside, but the passenger side was completely engulfed in flames. He stated that he suffered burns to both of his hands and was treated for smoke inhalation.

On cross-examination, Mullins acknowledged that he told police at the hospital that he "squealed" the Mustang's tires at the traffic light, saw the police, and panicked. He acknowledged that what he told police at the hospital was different from his trial testimony and said that he may have been confused on the night of the crash. He said he probably squealed the Mustang's tires as he pulled away from the traffic light. He stated that he did not want to drag race the appellant, that the appellant's Viper stayed in the right lane beside him and would not let him move over into the right lane, and that he just wanted to get in front of the Viper so he could go home. He said he was confused at the stoplight because the appellant "was setting there egging me on." He stated that he and the appellant "took off" at a high rate of speed from the traffic light and that he knew the Viper was right behind him because he saw the Viper's headlights. He said that he did not see Officer Wilson's patrol car traveling south and that he did not know why he was driving 130 miles per hour. He surmised that Officer Wilson "had a mis-recollection" about pulling Courtney Beard out of the burning CRV.

Lieutenant Becky West was recalled to testify on Mullins' behalf. She stated that a photograph taken after the crash showed skid marks from the Mustang to the point of impact with the CRV and showed that the Mustang was moving to the left at the time of the crash.

She explained that skid marks on pavement were caused by rotating tires that were slowing down.

Johnson City Police Officer Tony Ward testified for the appellant that on the night of September 24, 2005, he was riding with Officer Jeff Wilson and that they were traveling south on North Roan Street. Officer Ward saw a black Mustang at the intersection with Broyles/Browns Mill Roads. The traffic light at the intersection had turned green, and the Mustang's back wheels began spinning. Officer Ward said that smoke was coming from the tires and was "going everywhere" and that the Mustang "looked like it was getting ready to take off at a high rate of speed." The Mustang sped away from the light and passed them heading north. Officer Wilson turned on his patrol car's blue lights and tried to make a u-turn. Finally, another patrol car blocked traffic so that Officer Wilson could turn around. Officer Wilson turned off his patrol car's emergency lights, and he and Officer Ward began looking for the Mustang. As they passed under Interstate 26 and approached Springbrook Drive, they saw a large explosion of flames. About two hours after the crash, Officer Ward wrote a statement. He acknowledged that he did not mention a red car in the statement. He said he did not see two cars racing.

On cross-examination, Officer Ward acknowledged that the events happened quickly and that he was focused on the Mustang's smoking tires. He said that he saw a red car beside the Mustang but that his attention was on the Mustang.

Johnson City Police Officer Charles Fobbs testified that on the night of September 24, 2005, he was on patrol. Near Princeton Road and Broyles Street, he saw a Mustang with its tires spinning stopped at a traffic light. When Officer Fobbs drove to the intersection of North Roan and Broyles Streets, he saw Officer Wilson's patrol car and saw Officer Wilson turn on the car's emergency lights. Officer Fobbs pulled into the street, and Officer Wilson made a u-turn and drove north. Officer Fobbs also drove north on North Roan Street. He acknowledged that in a statement he wrote on the night of the crash, he did not mention a red Viper. He said that he did not see the Viper until after the crash and that the Viper was in a parking lot. He said he did not see cars racing.

On cross-examination, Officer Fobbs testified that he could hear the Mustang's engine. He acknowledged that he was focused on the Mustang and that he was not paying attention to any other cars.

James Evangelista testified that on the night of September 24, 2005, he left the Carnegie Hotel and drove north on North Roan Street. When he got to the Science Hill intersection, a black Mustang was directly in front of him, and a Viper was beside the Mustang. Evangelista and the Mustang were in the left lane, and the Viper was in the right

lane. He said that when he first saw the cars, "there was some noise going on . . . as far as the motors revving" and that the Mustang was trying to "entice" the Viper to race. The cars continued traveling north on North Roan Street but had to stop at some additional traffic lights. The driver of the Mustang continued revving the engine and "squealing the tires when he took off." Evangelista also heard the driver say, "[L]et's run" at one of the stoplights, but the Viper's driver shook his head no.

Evangelista testified that at the Sunset Drive/Princeton Road intersection with North Roan Street, he was directly behind the Viper in the right lane and that the Mustang was in the left lane. He stated that when the traffic light turned green, the Mustang "shot out real fast, squealing the tires, going even sideways a little bit to take off." The Viper pulled away from the light at a normal rate of speed, but the Mustang sped ahead. Evangelista saw a patrol car's emergency lights turn on, and the Mustang sped away even faster. The Viper continued traveling north and did not race the Mustang. Evangelista said he heard a very loud "screeching" sound, saw smoke, heard a crash, and saw flames. He parked at a convenience store and went inside to buy a pack of cigarettes. When he came outside, he saw the Viper in the parking lot next door.

On cross-examination, Evangelista testified that he did not remember seeing the Mustang and the Viper in the same lane of traffic. When confronted with Ben Stevens' testimony about being directly behind the Viper at the Sunset Drive/Princeton Road intersection, Evangelista said he "believe[d]" he was directly behind the Viper at the intersection. He said he did not see the Viper inching forward, trying to instigate a race. He acknowledged that he did not approach the police after the crash and tell them about what he had seen.

Joe Doane testified that on the night of September 24, 2005, he was driving north on North Roan Street. His wife, Janice Conner, and Howard Conner were riding with him. He first saw the Mustang on North Roan Street at Mockingbird Lane. The Mustang pulled up beside the Doane car and drove away from the traffic light at a high rate of speed. He said that the Viper was "right behind" the Mustang, that the two cars "did the same thing" at the Mountcastle intersection, and that the two cars "were sort of . . . rat racing through town from red light to red light." When the cars stopped at the Sunset Drive/Princeton Road intersection, the Viper was in the right lane and was stopped beside the Mustang. Joe noticed that the occupants of the two cars appeared to be communicating back and forth. When the traffic light turned green, the Mustang pulled away at a high rate of speed, and the Viper appeared to pull away at a normal rate of speed. However, Joe acknowledged that he was watching the Mustang, not the Viper, and that he did not know what happened to the Viper at that point. He stated that although the appellant did not appear to be racing at the Sunset

Drive/Princeton Road intersection, the appellant had been racing prior to reaching the intersection.

Joe testified that as he continued driving north, he saw blue lights on a patrol car. He said the Mustang drove by the patrol car at a "high rate of speed and he never did let up." Joe never saw the Mustang's brake lights illuminate. When Joe reached the Interstate 26 bridge, he saw flames. He turned right onto Springbrook Drive and passed the Viper traveling toward North Roan Street and the crash. Four days after the crash, Joe contacted the police and gave a statement to Lieutenant West. He acknowledged that in his statement, he did not say he saw the Viper "right behind" the Mustang as the cars were traveling on North Roan Street. He also acknowledged that although he said in his statement that the Mustang squealed its tires at the Mountcastle intersection, he did not mention the Viper.

On cross-examination, Joe testified that the Mustang's and the Viper's engines were revving at the Sunset Drive/Princeton Road intersection and that the occupants of the cars were talking with each other. He acknowledged that his testimony differed from Janice Conner's testimony and said that he did not know any reason why she would not tell the truth. When Joe first saw the Mustang, the Doane car was stopped in the right lane at the Mockingbird Lane intersection. After Joe drove through the Mountcastle intersection, he moved into the left lane. At the Sunset Drive/Princeton Road traffic light, the Mustang and the Doane car were both in the left lane. The Doane car was behind the Mustang, and one car separated them. The Viper was stopped beside the Mustang in the right lane. Although Joe did not see the Mustang's brake lights illuminate prior to its hitting the CRV, he acknowledged that he may not have been in a position to see them. He said that from red light to red light, the Viper was "right behind the Mustang, aggressively pushing."

Tanya Dishner testified that on September 24, 2005, she was attempting to pull onto North Roan Street and saw a red Viper stopped in the right lane at a traffic light. Suddenly, she heard an engine revving and saw a black Mustang with the Viper. When the traffic light turned green, the cars drove north on North Roan Street. She said that the driver of the Mustang continued to rev the engine and that the Viper "was just cruising along with traffic." Dishner pulled out behind them and saw them again at the Sunset Drive/Princeton Road stoplight. Dishner and the Viper were stopped in the right lane, and a large vehicle was in front of Dishner, blocking her view of the Viper. The Mustang was stopped in the left lane. Dishner said that when the light turned green, she saw the Mustang "burn his wheels, and smoke come up. And he burnt out." She said that the Mustang "took off," that she saw a patrol car's emergency lights turn on, and that the Mustang "took off even harder, faster." She said that she did not see the Viper but that she would have seen the Viper if it had pulled away from the intersection at a high rate of speed. On cross-examination, Dishner

acknowledged that her attention was focused on the Mustang. She saw the Viper pull into a parking lot after the crash.

Johnson City Police Officer Steve Bowman testified that on the night of September 24, 2005, he was on patrol and was dispatched to the Johnson City Medical Center. He saw Bradley Mullins in the trauma room and introduced himself to Mullins. Officer Bowman stated that Mullins said, "I saw the cops and panicked." Officer Bowman asked Mullins what he meant, and Mullins said he was stopped at the traffic light, "squealed" his car's tires, saw the police, and panicked.

On cross-examination, Officer Bowman acknowledged that Mullins was in a hospital bed and was receiving treatment when he spoke with Mullins. However, Officer Bowman did not see Mullins hooked up to an IV. He acknowledged that he was not sent to the hospital to conduct a full interview with Mullins and said that he was unaware Mullins gave a 20-page statement to police on October 13, 2005. On redirect examination, Officer Bowman testified that Mullins understood the officer's questions and responded appropriately.

Judy Vines testified on rebuttal for the State that she was a passenger in Ben Stevens' car on the night of the crash. She said that about 11:30 p.m., they were traveling north in the right lane on North Roan Street and that a black Mustang and a red Viper were traveling in the left lane "at a very high rate of speed, faster than normal." The Viper was behind the Mustang. Vines said that as the cars approached the stoplight at the Sunset Drive/Princeton Road intersection, the Viper "cut us off and jumped in front of us." The Viper was stopped directly in front of Stevens' car in the right lane. The Mustang was in the left lane and was stopped beside the Viper. The Mustang's brake lights were illuminated, but the Viper's brake lights were not. Vines said that the Viper "kept inching up through the red light" and that both cars' engines were revving. She stated that when the traffic light turned green, the Viper was "almost halfway through the red light" and that both cars "took off . . . at a very high rate of speed." Vines had a clear view of the cars and saw the Mustang fishtail. She said that the driver of the Mustang did not lose control and that both cars "were just gone." She said that although the Viper left the stoplight at a very high rate of speed, it "backed off" toward Bennigan's. Vines saw the Viper's brake lights come on, and she stopped paying attention to the car at that point. She and Stevens talked to the police after the crash.

On cross-examination, Vines testified that Stevens was her boyfriend and that they talked about this case. She said that at the Sunset Drive/Princeton Road intersection, the Mustang's tires were not spinning and there was no smoke. However, a large cloud of smoke arose when the light turned green and the car fishtailed.

-13-

The jury convicted both defendants of reckless homicide, a Class D felony, as a lesser included offense of second degree murder; vehicular homicide, a Class C felony; reckless aggravated assault, a Class D felony; felony reckless endangerment, a Class E felony; and drag racing, a Class B misdemeanor. The jury found the defendants not guilty of attempted second degree murder. During the sentencing hearing, the trial court dismissed the drag racing convictions based upon the statute of limitations.

## A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his convictions. Specifically, he argues that (1) the evidence regarding the drag race is so disputed that a reasonable doubt exists; (2) he could not be held criminally responsible for the crimes because no rational jury could conclude that Mullins' actions were the natural and probable consequence of the appellant's actions; and (3) he cannot be held criminally responsible for Mullins' actions because the trial court later dismissed his conviction for the target crime, drag racing. The State contends that the evidence is sufficient. We agree with the State.

### 1. Drag Racing

The appellant contends that the evidence is insufficient to support his convictions because it fails to show he was drag racing and, therefore, that he could not be held criminally responsible for the collateral crimes. In support of his argument, he contends that the trial witnesses were "all over the map" as to whether he drag raced Mullins and notes that not even Joe Doane and Janice Conner, who were riding in the same car, testified consistently. The State contends that the evidence shows the appellant was drag racing. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). As instructed to the jury, a person commits the crime of drag racing if the person uses "any motor vehicle for the purpose of the accepting of, or the carrying out of any challenge, made orally, in writing, or otherwise, made or received with reference to the performance abilities

of one (1) or more motor vehicles." Tenn. Code Ann. § 55-10-501(1)(E). Drag racing on a public highway is a Class B misdemeanor. Tenn. Code Ann. § 55-10-502(a).

Janice Conner testified for the State that the Mustang and the Viper "took off abruptly" from the Sunset Drive/Princeton Road intersection and that both cars disappeared over a small hill. Ben Stevens testified that the appellant's car was inching up to the red light with its motor revving and that both cars "took off like a shot," although the Viper later "backed off." At the crash scene, Stevens angrily confronted the appellant and accused him of racing. Judy Vines testified that the Viper, with its engine revving, kept inching forward at the intersection and that the Mustang and the Viper left the intersection at a very high rate of speed. Bradley Mullins testified that the Viper was right behind him as they sped away from the traffic light. Officer Jeff Wilson testified that the cars "took off at a pretty fast pace" from the intersection. The appellant contends that Officer Wilson could not be testifying truthfully because he failed to say anything in his statement about a red Viper or seeing two cars racing. However, the appellant questioned Officer Wilson about his failure to include such important information in his statement. Regardless of whether the jury accredited Officer Wilson's testimony, the other witnesses' testimony supports the jury's conclusion that the appellant raced Mullins. As we have stated, the jury, not the appellate court, determines the credibility of the witnesses and the weight and value to be given their testimony. Taken in the light most favorable to the State, the evidence shows the appellant drag raced Mullins.

## 2. Natural and Probable Consequences Rule

Next, the appellant contends that even if he briefly drag raced Mullins, the evidence is insufficient to support the convictions because the evidence shows that he had "backed off" from the race and therefore Mullins' crashing into the CRV was not the natural and probable consequences of the appellant's actions. The State argues that but for the appellant's actions, Mullins would not have crashed into the CRV. We conclude that the crimes were the natural and probable consequences of the appellant's actions.

In its jury charge, the trial court instructed the jury on the theory of criminal responsibility.[3] "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the

---

[3]We note that when it instructed the jury on the appellant's criminal responsibility, the trial court also instructed the jury that it could take into consideration "any evidence offered that the [appellant] attempted to thwart . . . or withdraw from any of the offense[s] that followed from the original offense."

-15-

actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Specifically, when an appellant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the appellant is responsible for all natural and probable consequences of his co-defendant's actions during the commission of the crime. See State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997). Specifically, the natural and probable consequences rule

> extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime.

State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000).

The evidence established that the appellant drag raced his co-defendant on a four-lane highway, at 11:30 p.m. on a Saturday night, in Johnson City. Aerial photographs introduced into evidence at trial show that the area of North Roan Street where the race and resulting crash occurred is lined with businesses and requires numerous traffic lights to maintain the safe flow of traffic. Many other cars were on the road at the time of the crash, and traffic was heavy enough that Officer Fobbs had to stop northbound traffic in order for Officer Wilson to make a u-turn in pursuit of the Mustang. As our supreme court has explained, "[T]he natural and probable consequence rule 'presupposes an outcome within a reasonably predictable range.'" Id. at 276 (quoting Carson, 950 S.W.2d at 955). Furthermore, "this is a determination within the province of the jury as finder of fact." Id. at 276. We conclude that the jury could reasonably find that the crimes were the natural and probable consequence of the appellant's and Mullins' drag race. Again, the evidence is sufficient to support the convictions.

### 3. Statute of Limitations

The appellant contends that his convictions must be reversed because the trial court dismissed the "target offense," drag racing, during the sentencing hearing based on the statute of limitations. The State argues that the jury was not required to convict the appellant of drag racing in order to find him criminally responsible for the collateral offenses; therefore, the fact that the trial court later reversed the appellant's conviction based upon the statute of limitations does not require reversal of his remaining convictions. We conclude that the appellant is not entitled to relief.

"The natural and probable consequences rule arose as a common law component of criminal responsibility and extends criminal liability to the crime intended by a defendant, and collateral crimes committed by a co-defendant, that were the natural and probable consequences of the target crime." State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002). Howard, 30 S.W.3d at 276, requires that for a defendant to be convicted of a crime under the theory of criminal responsibility and the natural and probable consequences rule, a jury must find

> (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime.

As noted by the State, the first prong of Howard requires the jury to find that the elements of the target crime exist, which the jury did in this case. The trial court's post-trial reversal of the drag racing conviction was based solely on the statue of limitations. As the United States Supreme Court has stated, "[A] defendant who has been released by a court for reasons required by the Constitution or laws, but which are unrelated to factual guilt or innocence, has not been determined to be innocent in any sense of that word, absolute or otherwise." United States v. Scott, 437 U.S. 82, 98 n.11 (1978). Instead, a statute of limitations defense simply "represents a legal judgment that a defendant, although criminally culpable, may not be punished." Id. A statute of limitations defense does not negate an element of the offense. Therefore, the appellant is not entitled to relief.

## B. Motion to Sever

The appellant contends that the trial court erred by denying his motion to sever his trial from that of his co-defendant. He argues that their cases should have been severed because they were based upon different legal theories and factual considerations that could have confused the jury. He also contends that the highly emotional nature of the case could have resulted in the jury's convicting him based upon his co-defendant's "unilateral acts." The State argues that the trial court properly refused to grant the motion to sever. We agree with the State.

In January 2006, the appellant and Mullins were charged separately by presentment. Shortly thereafter, the State filed a motion to consolidate on the grounds that the crimes were a result of the same transaction, involved the same scheme or plan, and the facts of one defendant's case would be relevant to the other's case. In a response to the State's motion, the appellant argued that the theories of the defendants' cases were different because the jury

had to find the appellant guilty of drag racing in order to convict him of the collateral offenses whereas the jury could convict Mullins of the offenses without finding him guilty of drag racing. The appellant also argued that separate trials would avoid a Bruton problem resulting from a statement Mullins gave to the police and would allow the appellant to question Mullins about the statement at the appellant's trial.

At the hearing on the motion, Judy Vines testified that about 11:40 p.m. on the night of September 24, 2005, she was traveling on North Roan Street with Ben Stevens in a Toyota four-wheel-drive pickup truck. She said that as they were preparing to stop at a traffic light, a red Viper "cut us off and jumped in front of us in the right hand lane." A black Mustang was stopped in the left lane beside the Viper. Vines noticed that the Mustang's engine was revving and that the Viper "kept inching up, just revving his motor, inching up and inching up." She said that by the time the traffic light turned green, the Viper "was over halfway though the red light" and that both cars "took out at an extremely high rate of speed." She stated that the Mustang "was gone" and that the Viper was "very fast also." As Stevens and Vines approached the Interstate 26 underpass, Vines saw flames. She saw the Mustang at the crash scene and saw the Viper parked in a parking lot.

On cross-examination, Vines testified that the Viper's convertible top was down. While the cars were stopped at the traffic light, the appellant kept looking over at the Mustang, but Vines never saw him shake his head "no" from side to side. She said that after the cars left the stoplight, the Viper slowed down "in front of Bennigan's." After the crash, Vines saw the appellant and Stevens speaking with the police.

The State informed the trial court that it was not going to use Mullins' videotaped statement during its case-in-chief. The trial court[4] granted the motion to consolidate, stating as follows:

> The State has offered very clear, convincing proof of what
> would be a common scheme or plan. You don't have to
> communicate by waiving or hand signals. . . . But, I mean, you
> can communicate by just revving your motor. That's all it takes
> is non-verbal communication. So the [S]tate has clearly made
> out that there is a common scheme or plan, and . . . it is clear
> that the two indictments charge each of the defendants with the
> same offenses, same date. The defense has not made a showing
> of prejudice. The jury would have to be instructed that the jury

---

[4]The judge who presided over the hearing on the motion to consolidate recused himself on December 12, 2006, and did not preside at the trial.

will view each defendant's case separately, considering the evidence only that is applicable to each defendant.

In May 2007, the appellant filed a motion to sever his trial from that of his co-defendant, making the same arguments as he had previously. In addition, the appellant claimed that severance was warranted because he recently had learned that his co-defendant planned to offer expert witness testimony "to the effect that due to [Mullins'] age . . . , his state of mind . . . may have been [a]ffected by what Defendant Mullins will claim was overly aggressive behavior by Defendant Phillips" and because Mullins planned to have a witness testify that the appellant tried to engage the witness in a drag race several weeks prior to the crash. In a written order, the trial court denied the motion to sever. At the appellant's new trial hearing, the trial court ruled that the appellant's motion to sever had been properly denied because "everything was interwoven." The appellant contends that the court should have granted his motion because the cases "depended on wholly different legal theories and factual considerations." He also contends that given the highly emotional nature of the case, it was "far too easy for the jury to convict [him] based even in part on the unilateral acts of Defendant Mullins and their horrific results."

Tennessee Rule of Criminal Procedure 14(c)(2) provides that a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Whether to grant a severance lies within the sound discretion of the trial court. State v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981)). This court will not find an abuse of the trial court's discretion unless the record clearly shows that the defendant was so prejudiced by the joint trial that the granting of a severance became a judicial duty. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

We conclude that the trial court did not abuse its discretion by denying the appellant's severance motion. More than sufficient evidence was presented in this case to show that the appellant drag raced Mullins and even instigated the race. Although evidence was presented that the appellant "backed off" while Mullins continued speeding north and crashed into the CRV, "the mere fact that damaging proof against one defendant is presented will not, by itself, entitle another defendant to a severance." Meeks, 867 S.W.2d at 369. Instead, the defendant must show that he or she "was clearly prejudiced by the evidence regarding the co-defendant to the point that it became a judicial duty to grant a severance." Id. The appellant has failed to show any prejudice in this case. As the trial court noted, the facts were so intertwined that a joint trial was proper. The facts were equally relevant to both cases such that a severance would not have lessened the impact on the appellant. Moreover, the fact that the jury found the defendants guilty of the lesser included offense, reckless homicide, and

-19-

not guilty of attempted second degree murder demonstrates that the jury was not swayed by the "highly emotional nature of the case" and carefully considered the evidence. The appellant is not entitled to relief.

## C. Improper Witness Testimony

The appellant contends that the trial court allowed two State witnesses, Lieutenant Becky West and Stephanie DeMaria, to give improper testimony. Regarding Lieutenant West's testimony, the appellant contends that she improperly testified about his asking her if he needed a lawyer. As to Stephanie DeMaria, the appellant contends that her testimony violated Tennessee Rule of Evidence 404(b). We conclude that the trial court erred with regard to Lieutenant West's testimony but that the error was harmless.

### 1. Lieutenant Becky West

After Janice Conner, Keith Harris, and Officer Wilson testified, Lieutenant West testified for the State. During her testimony, she stated that on the morning of September 26, 2005, she and other officers were continuing their investigation at the crash scene, that the appellant arrived, and that he asked her about the investigation. The State briefly stopped its direct examination, requested that the parties approach the bench, and informed the trial court that "this is a statement where he said . . . do you think I need a lawyer." The appellant objected, and the trial court stated, "I do have a problem with that. . . . I'm just concerned [about] the prejudicial effect that it will have." The appellant's co-defendant argued that the statement was relevant and admissible because it "supports a guilty conscience" by the appellant. In a jury-out hearing, the State informed the court that additional witnesses were going to accuse the appellant of drag racing Mullins. The trial court held that the appellant's question to Lieutenant West was relevant to the appellant's state of mind and that the prejudicial effect of the statement did not outweigh its probative value. The trial court ruled that the statement was admissible, and Lieutenant West's testimony resumed. She testified that while she was investigating the crash scene on September 26, the appellant asked her, "[D]o you think I need to get a lawyer[?]" The appellant contends that the prejudicial effect of the statement outweighed its probative value.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

-20-

The State argues that the appellant's question to Lieutenant West was relevant to the appellant's state of mind because it "indicated that he recognized his involvement in the incident." We disagree. At most, the statement showed that the appellant was concerned he had been or would be implicated in the crimes and, therefore, may need legal representation. Regardless, even if relevant it did not show that he thought he was involved in the incident or responsible for the crash. Therefore, we conclude that the trial court erred by ruling the appellant's question to Lieutenant West was relevant and admissible. However, we also conclude that the trial court's error was harmless. Ben Stevens later testified that he heard the appellant say after the crash that the appellant "hadn't done anything, that they would try and pin it on him, that he . . . wasn't racing." Stevens angrily confronted the appellant, telling the appellant that he had seen the appellant racing. Obviously, the appellant knew he was going to be accused of racing Mullins. It was completely reasonable for him to be concerned that he would be charged in this case, and, therefore, the statement was not particularly prejudicial. Therefore the error was harmless, and the appellant is not entitled to relief.

## 2. Stephanie DeMaria

During the State's case-in-chief, the prosecutor informed the court that the State had found a witness the State had been unable to locate previously, that the witness was present, and that the State planned to have the witness testify. The trial court allowed defense counsel to meet with the witness, Stephanie DeMaria. After the meeting, defense counsel for the appellant informed the court that it believed DeMaria was going to testify that someone in a red Viper attempted to engage her in a race earlier on the night of September 24, 2005, and that such testimony was inadmissible pursuant to Tennessee Rule of Evidence 404(b). Counsel requested a jury-out hearing, but the trial court stated that it did not need to hear her testimony and that

> the bottom line is it [is] a drag racing, or not a drag racing case. That's for the jury to decide, not me. . . . And I think . . . the [S]tate under probably 404 if you want to speak of it in terms of wrongs, or acts, I think it becomes appropriate under that section because it was within the same evening, the same conduct that the [S]tate says that led to this, and --- it's probative value because that far outweighs it . . . any prejudicial effect it'd have on this defendant.

DeMaria later testified for the State that about 9:00 p.m. on September 24, 2005, a red Viper tried to race her and her husband as they were traveling north in the their Dodge Neon on Highway 11E. When DeMaria's husband refused to race the Viper, the Viper drove ahead

of them and raced a Nissan. Later that night, DeMaria and her husband arrived at the crash scene and saw the red Viper in a parking lot.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). In other words, a party may not use character evidence to show that a person acted in a particular way because he or she had a propensity to do so. State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999); State v. Parton, 694 S.W.2d 299, 304 (Tenn. 1985) (observing that evidence of another crime is not admissible to show that the defendant is the kind of person who would tend to commit the offense); State v. Tizard, 897 S.W.2d 732, 743 (Tenn. Crim. App. 1994) (noting that character evidence may not be used to show a propensity to act). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

In our view, the fact that the appellant tried to race DeMaria and her husband only two hours prior to the appellant's racing Mullins does not qualify as propensity evidence. Furthermore, the evidence was relevant to rebut the appellant's claim that Mullins' instigated the race. The evidence was not offered as propensity evidence and was admissible.

D. Sentencing

The appellant contends that his six-year sentence for vehicular homicide is excessive because the trial court misapplied enhancement factors and improperly refused to consider mitigating factors. He also contends that the trial court erred by denying alternative sentencing. The State argues that trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, Terry Hensley, Cortney Hensley's father, testified that the victim was seventeen years old at the time of her death. The week prior to the crash, Cortney had been elected the most popular girl in her senior class. The night before she died, she had been elected homecoming queen. Terry found out about crash from Courtney Beard's fiance, who telephoned the Hensleys at their home. Terry and his wife went to the hospital and were told that their daughter had been killed. He said that since the victim's death, "Everything's different . . . . [T]here's always an empty chair." He described his daughter as "an awesome kid" and his "baby girl." He stated that dealing with her death was "a daily thing" and that he and his wife had not changed the victim's bedroom.

Cathy Beard, Courtney Beard's mother, testified that the crash devastated her daughter, who "struggles daily." Courtney Beard and Cortney Hensley had been best friends

since kindergarten. Although they went to different high schools, the girls were very close. On the night of the crash, the victims had picked up Cortney Hensley's homecoming photographs from Walgreens, and they were looking at the photographs when Bradley Mullins crashed into the back of the CRV. After the wreck, Cathy Beard went to the hospital. Her daughter was on a ventilator and was burned so badly that Cathy had to identify her from a dress the victim was wearing. The victim was transported to Vanderbilt Hospital and was unconscious for one month. She had numerous surgeries with more planned. Cathy said that the victim would "never be whole again," took anti-depressants, was physically scarred, and was in pain.

Sherry Phillips, the appellant's wife, testified that they had been married for almost nineteen years and had two sons, ages sixteen and four. She said the appellant owned his own landscaping business, was a good provider for his family, and was a good father. Prior to the crash, the appellant attended his oldest son's ball games. However, since the crash, the appellant had stopped going to the games in order to avoid "trouble." Sherry said that she, the appellant, and their oldest son had been "confronted" about the appellant's involvement in the case and that someone had vandalized her son's truck by writing "redrum," murder spelled backwards, on the back of it. She stated that the appellant's business trucks also were vandalized and that business revenue declined due to publicity. Sherry stated that if the appellant were incarcerated, she would run the business as best she could. She said that the appellant was an active member of First Freewill Baptist Church, that he suffered from stress since the incident, and that he stopped managing his diabetes. On the night of the crash, their oldest son, who was fourteen years old at the time, had been cleaning parking lots with the appellant. The appellant telephoned his wife, told her about the wreck, and told her that he was not involved. Sherry stated that she was very sorry for the Beard and Hensley families, that the appellant would abide by any rules of probation, and that she would help him follow the rules. On cross-examination, Sherry testified that their son was not in the Viper with the appellant at the time of the crash.

The appellant's presentence report was introduced into evidence. According to the report, the then forty-year-old appellant graduated from high school in 1985. The appellant reported that he had never used alcohol or illegal drugs, that his mental health was good, and that his physical health was poor due to diabetes, asthma, and problems with his legs and feet. The appellant reported that he had been self-employed since 1988. The report does not list any prior convictions for the appellant but shows that he was cited for speeding on or about August 25, 2005. The report also shows that the appellant was involved in an accident in 1988 after he fell asleep while driving and crossed the center line, striking another vehicle. The driver of the second car died six days later. According to the report, in 1990, the appellant was driving a vehicle that struck a pedestrian. The appellant was cited for running a stop sign and violating the motor vehicle registration law.

The trial court dismissed the drag racing conviction based on the statute of limitations[5] and merged the reckless homicide conviction into the vehicular homicide conviction. It stated that as a Range I, standard offender, the appellant was facing three to six years for vehicular homicide, a Class C felony; two to four years for reckless aggravated assault, a Class D felony; and one to two years for Class E felony reckless endangerment. See Tenn. Code Ann. § 40-35-112(a)(3), (4), (5). The trial court noted that in 2006, 43.8% of standard offenders convicted of Class C felonies received sentences of incarceration and that the average length of incarceration was 49 months. The court also noted that the appellant had been charged with filing a false report previously, and the court considered the charge as prior criminal behavior. Thus, the trial court found enhancement factor (1), that the appellant has a "previous history of . . . criminal behavior, in addition to those necessary to establish the appropriate range," applicable. Tenn. Code Ann. § 40-35-114(1). The court also applied enhancement factor (2), that the appellant "was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2). The court gave great weight to enhancement factor (2), "enough to take [the appellant] all the way to the max on the sentence of six years," and less weight to factor (1). Regarding mitigating factors, the trial court "looked for . . . a chance to bring that down from six years," but found no mitigating factors applicable. The court sentenced the appellant to six years, the maximum punishment in the range, for the vehicular homicide conviction. It sentenced the appellant to two years for reckless aggravated assault and to one year for the felony reckless endangerment, the minimum punishment in the range for each offense. The court ordered that the sentences be served concurrently.

In considering the appellant's request for alternative sentencing, the trial court again considered the appellant's having been charged in 2005 with filing a false report as prior criminal behavior. See Tenn. Code Ann. § 40-35-114(1). As part of the appellant's "social history," the trial court noted that the appellant's 1988 wreck with another vehicle resulted in another person's death. Otherwise, the court found the appellant's social history to be favorable for alternative sentencing. The court also found the appellant's physical and mental history, his potential for rehabilitation, and the interest of society in being protected from his future criminal conduct to be factors favorable for alternative sentencing. However, the court determined that the nature and circumstances of the offenses warranted the appellant's serving his sentences in confinement, stating that this case was "horrifying, shocking, unbelievable." The court also determined that confinement was necessary to avoid depreciating the seriousness of the offenses and to provide an effective deterrence to others

---

[5]Although the appellant was charged with most of the crimes by presentment on January 10, 2006, he was not charged with drag racing until he was charged by "re-indictment" on November 6, 2006. The statute of limitations for misdemeanors is "twelve (12) months after the offense had been committed." Tenn. Code Ann. § 40-2-102(a).

likely to commit similar offenses. See Tenn. Code Ann. § 40-35-103(B). Thus, the trial court denied the appellant's request for alternative sentencing.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

1. Excessive Sentence

The appellant argues that his six-year sentence is excessive because the trial court erred by finding he was a leader in the commission of the offenses, by failing to apply mitigating factors, and by determining that the sentence was warranted by the nature and characteristics of the crimes. We disagree.

Regarding enhancement factor (2), that the appellant was a leader in the commission of the offenses, he contends that "if anyone was a 'leader' in the vehicular homicide offenses, it was Defendant Mullins, and not Defendant Phillips." He also argues that because he and Mullins were equal participants in the race, neither one of them should be considered as leaders for enhancement purposes. In support of this argument, he notes that at the sentencing hearing, the trial court stated as follows:

> This is a case that takes two to tangle. You can't drag race by
> yourself. You've got to have two. And I will never know, nor
> will anyone else in this room ever know except two people, and
> that's Mr. Mullins and Mr. Phillips who started this drag race.
> . . . No matter how you look at it they both put it in motion.

However, we note that earlier in the sentencing hearing, the trial court also said, "But, I also think that this jury took and found that Mr. Phillips set some things in motion. And once he put those things in motion the end result was horrific." Such a statement demonstrates that the trial court believed the jury considered the appellant the instigator in this case. The testimony of Janice Conner, Ben Stevens, and Judy Vines supports that conclusion. At the very least, the trial court could consider both defendants to be leaders of the offenses. See State v. Tony Wayne Snyder, No. 03C01-9403-CR-00101, 1995 Tenn. Crim. App. LEXIS 927, at *22 (Knoxville, Nov. 21, 1995) (providing that in order for factor (2) to apply, "one does not have to be the leader in the offense, but merely a leader in the commission of the offense. . . . This is true even when there are only two parties to the offense."). Thus, the trial court properly applied enhancement factor (2).

Next, the appellant contends that the trial court erred by refusing to apply mitigating factors. The appellant argues that his sentences should be mitigated because he (1) played a minor role in the offenses; (2) "assist[ed] authorities in uncovering offenses committed by Defendant Mullins"; (3) "committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct"; and (4) had no criminal record, is married with school-aged children, and owned and operated several businesses to support his family. See Tenn. Code Ann. § 40-35-113(4), (9), (11), (13). As stated previously, the evidence suggests that the appellant instigated the drag race. Therefore, we refuse to find that he played a small role in the offenses. Even if the appellant spoke with the police after the crash, no proof was presented that he provided particularly helpful information. Therefore, he is not entitled to mitigation on that ground. Furthermore, testimony at trial that the appellant's Viper was closely following the Mustang and "rat racing" from stoplight to stoplight belies the appellant's claim that he committed the offenses under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. Nevertheless, we agree that the appellant is entitled to some mitigation due to his employment history. However, given the significant weight that the trial court placed upon factor (2), which was the court's prerogative, we believe the appellant's employment does not warrant reducing his six-year sentence.

We note that the trial court initially sentenced both defendants to six years for their vehicular homicide convictions. However, the trial court mitigated Mullins' sentence because Mullins, who testified at the sentencing hearing,[6] expressed remorse to the victims' families "from the bottom of his heart." "[G]enuine, sincere remorse is a proper mitigating factor." State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995). The appellant, on the other hand, has not expressed any remorse for his actions.

---

[6]Mullins' testimony was not included in the sentencing hearing transcript.

Finally, the appellant contends that his six-year sentence is excessive because throughout sentencing, the trial court "confus[ed] Defendant Phillips' criminal conduct in engaging in a brief drag race with Defendant Mullins' unilateral actions in continuing to accelerate, . . . darting from lane to lane . . . , and causing the tragic collision." Tennessee Code Annotated section 40-35-210(b)(4) provides that in determining a defendant's sentence and sentencing alternatives, the trial court is to consider the "nature and characteristics of the criminal conduct involved." The appellant argues that Mullins' crashing into the CRV "rests on Defendant Mullins' shoulder, and his alone." The appellant's repeated attempts to place all of the blame on Mullins is troubling because the evidence shows that but for the appellant's actions, no drag race would have occurred. The trial court properly considered that the nature and characteristics of the offenses warranted a six-year sentence for vehicular homicide.

## 2. Alternative Sentencing

The appellant contends that he should serve his six-year sentence on probation. An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a) (2006). The appellant's sentences meet this criteria. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5).

In the instant case, the appellant is a Range I, standard offender convicted of Class C, D, and E felonies; therefore, he is considered to be a favorable candidate for alternative sentencing. However, the trial court determined that the appellant should not be granted alternative sentencing because to do so would depreciate the seriousness of the offenses and would have no deterrent effect.

In denying full probation to avoid depreciating the seriousness of the offense, the criminal acts should be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. Zeolia, 928 S.W.2d at 462. We agree with the trial court that the facts of this case are shocking and horrifying. Once again, the appellant argues that the shocking and horrifying aspects of the crimes should not be applied to him because he did not crash into the CRV. However, a defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." State v. Lemacks, 996 S.W.2d 166, 171 (Tenn. 1999). Therefore, the trial court properly determined that confinement was necessary to avoid depreciating the seriousness of the offenses.

Regarding the need for deterrence, the trial court concluded that deterrence was necessary because the crimes were the result of intentional, knowing, or reckless conduct and because the appellant's crimes and convictions received substantial publicity beyond that normally expected in the typical case. See State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2001).

The instant offenses were the result of reckless behavior. See Tenn. Code Ann. §§ 39-13-213(a)(1) (vehicular homicide), -215(a) (reckless homicide), -103(b) (felony reckless endangerment), -102(a)(2) (reckless aggravated assault). Furthermore, the trial court was particularly concerned about deterring drag racing on busy streets, which endangers the lives of others, and noted that the case, which was televised on Court TV, was highly publicized. Finally, the appellant "has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions."

Finally, we note that a defendant's failure to accept one iota of responsibility for his criminal conduct reflects poorly on his potential for rehabilitation and is also a basis for a denial of probation. See Zeolia, 928 S.W.2d at 463. In our view, that consideration further justifies his serving his six-year sentence in confinement.

E. Judgment of Acquittal and Motion for New Trial

-28-

Finally, the appellant contends the trial court erred in denying his motions for judgment of acquittal and new trial. We note that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). This court examined the appellant's sufficiency claims, *supra*, and determined that the evidence was sufficient to support the appellant's convictions. Additionally, the issues raised in the motion for new trial have also been addressed. The decision to grant a motion for new trial rests within the trial court's sound discretion, and the court's findings will not be set aside unless the evidence preponderates against those findings. State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985). The appellant has not shown that the trial court abused its discretion in denying the motion for new trial; accordingly, he is not entitled to relief on that basis.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the appellant's convictions and sentences. However, the appellant's judgment of conviction for felony reckless endangerment shows that he was convicted of a Class D felony and sentenced to two years. Felony reckless endangerment is a Class E felony, and the trial court sentenced the appellant to one year for that conviction. Therefore, the case is remanded to the trial court for entry of a corrected judgment.

_____
NORMA McGEE OGLE, JUDGE